MARIE FRANCES MILLER, Appellee, *vs.* EMIL H. AHR-
BECKER, Exr., *et al.* Appellants.

*Opinion filed April 23, 1926.*

1. WILLS—*when instruction as to heirship of adopted child is
not proper in will contest.* Where the issue in a will contest is
submitted to the jury upon the special interrogatories as to whether
the testator was of unsound mind on the day he executed his will
and as to whether he was mentally incapable of making a valid
will on said date, it is not proper to instruct the jury as to whether
the contestant, being an adopted child, would inherit the estate of
the testator should the will be held invalid.

2. SAME—*what instruction as to testamentary capacity is im-
proper.* Where a will is contested on the ground of the mental in-
capacity of the testator, it is not proper to instruct the jury that
to defeat the will it is not necessary to prove the testator "tech-
nically insane" and that the contestant need show only that the
testator's mind was so weakened as to render him incapable of
making a valid will, as such instruction confuses the jury and tends
to distinguish between insanity and unsoundness of mind, when,
in fact, there is no difference in the meaning of the terms.

3. SAME—*what constitutes "sound mind and memory."* The ex-
pression "sound mind and memory" means "sound and disposing
mind," and is equivalent to the term "sanity."

4. SAME—*what instructions as to date of mental capacity are
improper.* Instructions in a will contest to the effect that if the
testator was of sound and disposing mind and memory at the time
he executed the will it is immaterial what was the condition of
his mind before and after that time are properly refused, as not
being sufficiently guarded to prevent misleading the jury.

5. SAME—*what constitutes capacity to execute a will—instruc-
tion.* To have sufficient mental capacity to execute a will the law
requires of a testator only that he know what he is about, the char-
acter of the business he is engaged in, what his property is, who
are the persons who are the natural objects of his bounty, and what
disposition he wants to make of his property; and in a will contest
it is proper to refuse an instruction that to defeat the will the
mental incapacity must be sufficient to render the testator incapable
of understanding the effect and consequences of his acts.

APPEAL from the Circuit Court of Cook county; the
Hon. IRA RYNER, Judge, presiding.

320—37

FREDERICK A. BROWN, and WILLIAM T. PRIDMORE, for appellants.

AARON R. EPPSTEIN, for appellee.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

The circuit court of Cook county entered a decree setting aside the will of Charles D. F. Harder, from which Emil H. Ahrbecker, the executor and trustee named in the will, and Hallie Kirkley, the sole surviving beneficiary of the trust, have appealed.

The appellee and contestant, Marie Frances Miller, was an adopted daughter of the testator and his only heir. The bill alleged that the testator at the time of making his will was of unsound mind, and the jury, besides the general finding on the issue that the instrument was not the last will and testament of the testator, in answer to three special interrogatories submitted by the court, found that the testator was on the day the will was executed of unsound mind, insane and mentally incapable of making a valid will. The appellants insist that these findings are contrary to the evidence and that error was committed by the court at the trial.

Harder was fifty-seven years old at the time of his death, on January 25, 1922. He had lived in Paxton, Illinois, until 1886, when he went to Chicago. He lived in Chicago or Evanston until 1919. In 1893 he was married. He was employed as a stationary engineer by the National Biscuit Company in 1898 and remained in its employment until 1918, when he was discharged. In 1899 or 1900 he bought a residence in Evanston, in which he lived with his wife and his mother until the spring of 1919. After his discharge he bought a farm of eighty acres near Hawkins, Wisconsin, to which he moved with his wife and his mother in the spring of 1919. His wife became seriously ill in a

short time and they all returned to Chicago, where she was found to be suffering from cancer in an incurable condition. She died on December 22 of that year. Harder and his mother then returned to the farm, where they lived in a barn, which was divided by a partition, on one side of which they lived while on the other side the horses and cattle were housed. The farm was mortgaged and Harder had bought the equity for $1000 cash. In April, 1920, he sold it for $4000 and returned with his mother to Chicago. He obtained employment in a machine shop as a porter and janitor, and they lived with their adopted daughter, the complainant, until June, when the mother went to the home of Frank Harder, a cousin of the testator, because Mrs. Miller would no longer keep her. She remained there for about two months and then moved to Monticello avenue, where she lived with the testator until her death, in January, 1921. The will was executed on January 17, 1921. After his mother's death Harder lived a short time at the home of William Toner, a short time with Frank Harder, and made a visit of about two weeks in Batavia, Illinois, from which he returned to Toner's house, where he remained until about Easter. He was then employed as a janitor at $105 a month, having the care of several buildings. He lived at the home of his employer, having a room on the third floor, and continued in that employment until his final sickness. On January 16, 1922, he was found in the boiler room of one of the buildings in which he served as janitor, sitting down, apparently unconscious. He was taken to St. Luke's Hospital and remained irrational until his death. The medical testimony shows, without contradiction, that his condition was the result of syphilis of the brain and spinal cord. He died on January 25, hypostatic pneumonia having developed about twenty-four hours before his death.

The appellant Hallie Kirkley was at the hospital as a patient at the time Harder's wife was there. She was a

woman of middle age who had lived in Paxton and she and Harder's mother had known one another there. Harder thought he remembered her as a girl in school, and after the death of his wife he wanted to marry her and wrote many affectionate letters to her. Whether she made any response to them does not appear and the record contains no evidence of her feeling toward him.

The parties called about an equal number of witnesses, and their testimony was contradictory and irreconcilable both as to the facts in regard to the appearance, habits, conversation, actions and conduct of the testator and as to their opinions in regard to his soundness of mind. The witnesses for the proponents testified that the testator was neat in his dress, clean as to his person, intelligent as to his conversation, normal as to his walk, of good ability to transact business, and that in their opinion he was of sound mind at the time of the execution of the will. The witnesses for the contestant testified that he was slovenly and careless in his dress; that he went unbuttoned, unkempt and unclean; that he slouched and dragged in his walk; that he was childish and incoherent in his talk, and that in their opinion he was of unsound mind. Some of these opinions are based on a less satisfactory foundation and are therefore entitled to less weight. More than half of the witnesses for the proponents were present or past employees or associates in business of the executor, one was his attorney, personally and as executor, who wrote the testator's will and was interested as a lawyer in the case at the time he testified. One of the witnesses for the contestant was her mother-in-law and another was distantly related to her. Two were physicians, another the nurse at the hospital in the testator's last illness, and the others were persons with whom he had lived, with whom he had been employed or by whom he had been employed, who were not related to the contestant and had no interest in the case. One was Dr. Krohn, a specialist of wide experi-

ence in nervous and mental diseases, who, in response to a hypothetical question of the contestant's attorney, expressed the opinion, based on the hypothesis of that question, that the testator was of unsound mind at the date of the execution of the will. Many circumstances were related in the testimony which have not been mentioned, but it is unnecessary to go into a discussion, in detail, of the evidence or of the value of the opinion of each witness or to express an opinion as to which side produced the preponderance of the evidence. So far as the determination of this case is concerned, such a discussion would lead only to the conclusion that the evidence on either side, in the absence of countervailing evidence, would sustain a verdict in favor of that side, and in such condition of the evidence it can not be said that the verdict is so manifestly against the weight of the evidence that it should be set aside for that reason. Under such circumstances it is important that the trial should be free from serious error on the part of the court. The appellants claim that such error occurred in the giving and refusal of instructions and the refusal to permit certain evidence offered by the defendants in rebuttal.

Instruction No. 14 given at the request of the complainant is the first instruction complained of. It is as follows:

"You are instructed that where a child is legally adopted, such child in contemplation of law, for the purpose of inheritance and all other legal incidents and consequences, is the same as if the child had been born in lawful wedlock to the adopting parents. You are instructed that it is the law of Illinois that if a male person who is a resident and citizen of Illinois and dies without making a valid will and leaves him surviving no widow, no father or mother, and no natural child or descendants of natural child but does leave him surviving a legally adopted child, then, under the law, such legally adopted child will receive all of the estate, real and personal, of such deceased male person."

The issue directed by the court to be submitted to the jury was whether the writing purporting to be the last will and testament of Charles D. F. Harder was his last will and testament, and three special interrogatories were submitted, to-wit: Was Charles D. F. Harder of unsound mind on January 17, 1921? Was he insane on January 17, 1921? Was he mentally incapable of making a valid will on January 17, 1921? There was no issue as to the appellee's heirship. The answer admitted the decree of adoption and that she was the testator's only heir. It was therefore improper to distract the attention of the jury from the single issue in the case by an instruction as to another feature of the case with which they had no concern.

Instruction No. 16 given at the request of the contestant was as follows:

"You are instructed that unsoundness of mind which would produce testamentary incapacity, need not necessarily require that the person should be technically insane but you are instructed that weakness of intellect arising from one or more causes might render a testator incapable of making a valid will and although you may believe from the evidence that Charles D. F. Harder was not technically insane, yet if you believe from the preponderance of the evidence, his intellect at the time of the making of the alleged will was so weakened from some cause or causes as shown by such preponderance of evidence as to render him incapable of making a valid will, you should find the issues for complainant, Marie Miller."

This was an imperative instruction to find a verdict against the will on the hypothesis contained in the instruction, and the hypothesis was that the jury believe, from the preponderance of the evidence, that the testator's intellect at the time of making the alleged will was so weakened as to render him incapable of making a valid will. No rule was given which the jurors were directed to follow as to how they were to determine that the testator was in-

capable of making a valid will. To make it easier for them
to arrive at a conclusion that he was so incapable, the in-
struction told the jury that unsoundness of mind which
would produce testamentary incapacity did not require that
the testator should be technically insane, but no light was
thrown on what was meant by technical insanity. The
substance of the instruction was that unsoundness of
mind which would produce testamentary incapacity was
that weakness of intellect which might render a testator
incapable of making a valid will. The jury were left to
determine for themselves what degree of weakness of in-
tellect would render a testator incapable of making a valid
will, with no advice from the court except that it did not
require that the person should be technically insane. Sev-
eral of the witnesses had testified that the testator was of
unsound mind, but on cross-examination stated that they
could not say he was insane, one of them using the word
"crazy." The confusion as to the question of testamentary
capacity thus shown in the minds of the witnesses might
very readily have induced the jurors to believe that there
was a difference in the meaning of insanity and unsound-
ness of mind when there is no such difference. We have
held the expression "sound mind and memory" to mean
nothing more than "sound and disposing mind" and equiva-
lent to the term "sanity." (*Waugh* v. *Moan,* 200 Ill. 298,
and cases cited on p. 305.) This is the same character of
instruction as that given in *Henderson* v. *Henderson,* 88 Ill.
248, (a divorce suit,) "that the only duty of the jury in
this case is to find, by a preponderance of proof, that the
complainant, Mrs. Henderson, is entitled to a separation
from George S. Henderson, the defendant," of which it
was said: "This instruction left to the jury,—not even
under the statute, or the rules, erroneous as they were, an-
nounced in other instructions, but on their own notions
of right or wrong,—to find whether a divorce should be
granted. This was the obvious effect, if not the precise

language, of this instruction, and it is seldom one is found so inherently vicious."

Instruction No. 11 asked by the appellants would have advised the jury that when the proponents had established the sanity of the testator at the time he executed the will by the oath of two of the subscribing witnesses then the *prima facie* case is made out, and in such case the complainant, contesting the will on the ground of insanity, has the burden of proving that the testator was insane at the time he executed the will. It was refused as asked but was modified by substituting the words "soundness of mind" for "sanity" and "unsoundness of mind" for "insanity," and was given as modified. The defendants excepted to the modification of the instruction, and argue that the changing of the instruction gave the jury to understand that less evidence was required to set aside the will than the law requires. However vulnerable the instruction may be in other respects it is not subject to this criticism, since "soundness of mind" and "sanity" are held to mean the same thing in the cases last cited.

Instructions Nos. 4 and 6, asked by the appellants and refused, instructed the jury that if the testator was of sound and disposing mind and memory at the time he executed the will it was immaterial what the condition of his mind was before and after that time. These instructions were properly refused because they were not sufficiently guarded to prevent misleading the jury. It is true that the issue was as to the soundness of mind of the testator at the time he executed his will and not as to any other time, before or after, but in determining his soundness of mind at the time he executed the will the question of the condition of his mind a reasonable time before or after was material. It was not material if the soundness of mind of the testator at the time he executed the will was established, but in determining whether the testator was of sound mind or not at that time his condition for a reasonable time be-

fore and after was material, and the instruction was likely to mislead the jury on this point.

Refused instruction No. 1 was as follows:

"You are further instructed that the derangement or imbecility necessary to incapacitate a man from making a valid will must be of that character which renders him incapable of understanding the effect and consequences of his acts."

The instruction states merely an abstract proposition of law, and its refusal was justified for that reason as well as because it demands too high a degree of capacity in requiring of a testator that he shall understand all the effect and consequences of his acts. The law only requires of him that he know what he is about, the character of the business he is engaged in, what his property is, who are the persons who are the natural objects of his bounty, and what disposition he wants to make of his property.

The appellants offered in rebuttal two letters to show a motive for Harder's disinheriting his daughter. The first was an abusive letter which her husband had written to Harder's mother in August, 1920, after the testator and his mother had left their house. The second was a letter from a lawyer, John E. Crahen, written to Charles G. Hendricks, the testator's attorney, stating that the appellee had received a letter from the latter in reference to a will left by the testator's wife, and that the appellee had been in the hospital for some time, but the writer of the letter had the will in his possession, and if Hendricks would send someone to call for it he would deliver the will to Hendricks' representative. The appellants also offered in rebuttal the testimony of Mrs. Frank Harder to show that the testator's mother was treated in an abusive manner when she returned to the contestant's home, after leaving it in June, 1920, for her clothes, and also testimony as to the manner in which Charles Harder walked in 1922. Objections were sustained because the evidence was not rebuttal. It is not

shown that the testator had any knowledge of any of these things, and the evidence was not competent either in chief or in rebuttal.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*