(No. 16243.—Decree affirmed.)
FRANK M. GROSH, Plaintiff in Error, *vs.* HENRY O. ACOM
*et al.* Defendants in Error.

*Opinion filed April 20, 1927.*

1. WILLS—*what undue influence will invalidate a will.* Undue influence, in a will contest, may be proved by circumstances, and less evidence is required where it is shown that the testator or testatrix was feeble in mind and body, but to invalidate the will the influence must be of such a character as to deprive the testator of free agency, be directly connected with the execution of the instrument and be operating at the time it is made, producing a perversion of the mind that made the will; and it is not sufficient merely to prove the existence of a fiduciary relation without showing that such relation was used in procuring the will.

2. SAME—*what necessary for fiduciary relation to create presumption of undue influence.* Evidence showing the existence of a fiduciary relation does not create the presumption of undue influence unless it is further shown that the fiduciary relation was used for the purpose of procuring the making of the will.

3. SAME—*what does not render certificate of oath of attesting witnesses incompetent.* The fact that the certificate of the oath of the attesting witnesses contains the statement that the testatrix was "under no constraint at the time she signed, sealed and acknowledged the same as and for her last will and testament" does not render the certificate incompetent in a will contest where the only objection to its introduction is that no proper foundation was laid and where witnesses properly identify the certificate and testify to the signature.

4. SAME—*when contestant cannot complain of rulings in admission of evidence.* A contestant of a will cannot complain of the court's ruling in sustaining objections to questions put to witnesses where he has not properly saved the ruling for review by stating to the court what the witnesses would have testified to if they had been allowed to answer.

5. SAME—*general rule as to burden of proof in will contest.* In a will contest the burden of proof is always on the proponents to establish the will as the last will and testament of the testator or testatrix by a preponderance of the evidence, but the burden of introducing evidence may, and does, shift to the contestants during the course of the trial.

6. SAME—*presumption of sanity favors proponents.* The law presumes that all adults are of sound mind until the contrary is proved, and the law throws the weight of this presumption into the scale in favor of the proponents, as sanity is the rule and insanity the exception.

7. SAME—*what instructions as to testamentary capacity are proper.* In a will contest it is proper to instruct the jury that the testatrix had sufficient mind and memory to make a will if at the time she had sufficient mind and memory to know and understand who her kindred were or who were the natural objects of her bounty, to recall to mind all her property and to make disposition of it understandingly according to purposes or plans formed in her mind, to understand the particular business in which she was then engaged and the nature of her act and the effect of her will, and that, having such mind and memory, she could make any distribution she saw fit and prefer one beneficiary over another.

8. SAME—*when jury should not be instructed as to prima facie case in will contest.* In a will contest it is proper to tell the jury in a proper manner that the clerk's certificate of the oath of the attesting witnesses is competent evidence, which they must consider with all the other evidence in passing on the issues; but where the proponents' case does not rest on such evidence, alone, the jury should not be told as to what makes a *prima facie* case and as to when the burden of producing evidence shifts from one party to the other, as such instruction tends to confuse the jury and does not help them decide the issue whether or not the proponents have established the will by the greater weight of the evidence.

9. SAME—*testator or testatrix need not have perfect mind and memory.* In a will contest the evidence for proponents need not establish the fact that the testator or testatrix had a mind and memory perfectly sound in every particular, as the law recognizes that a person may be of unsound mind and memory to some extent and still be competent to make a valid will.

10. INSTRUCTIONS—*what determines whether an erroneous instruction will reverse.* Whether or not errors in the record in the matter of giving instructions or otherwise will require a reversal of the case must necessarily depend upon the character and amount of proof in the record tending to support the finding and judgment of the court and the amount and character of the evidence to the contrary.

WRIT OF ERROR to the Circuit Court of Macon county; the Hon. JAMES S. BALDWIN, Judge, presiding.

LeForgee, Black & Samuels, W. E. Redmon, and King, Brower & Hurlbut, (Samuel B. King, of counsel,) for plaintiff in error.

E. V. Wierman, Whitfield, Deck & Coleman, and L. E. Stephenson, guardian *ad litem,* for defendants in error.

Mr. Justice Duncan delivered the opinion of the court:

Sarah E. Acom died testate in Macon county, September 5, 1920, at the age of about seventy-four years. Her will, dated September 15, 1919, was admitted to probate by the county court of said county October 18, 1920. She left surviving her as her heirs-at-law two brothers, Henry O. and John W. Acom; a sister, Mary E. Bruce; Mary L. Moore, John T. Grosh and Frank M. Grosh, children of her deceased sister Sophia Grosh; and Julia E. Stahl, a daughter of her deceased sister Ella Bruce. She died seized of a farm of 160 acres near Niantic and of an undivided one-fourth interest in a 65-acre timber tract located near the Sangamon river, in said county, north of her 160-acre tract. She owned personal property amounting to over $27,000, consisting of United States Liberty bonds, War Savings certificates, notes, cash and other articles of personal property. By her will she devised the east one-half of the 160-acre tract to her brother Henry and the west one-half thereof to her brother John. She bequeathed to her sister, Mary E. Bruce, one-half of her personal estate in notes, bonds and money. The other one-half of her personal estate in notes, bonds and cash was bequeathed to her brother John in trust for the benefit of Mary L. Moore, John T. Grosh and Frank M. Grosh, children of her deceased sister Sophia Grosh. She directed that the trust continue until the death of the last survivor of said beneficiaries, and during the continuance of the trust the trustee was directed to invest the fund and pay the net income, pro-

ceeds and interest therefrom to the beneficiaries, or to the issue of such of them as should die either prior to or after her death, and upon the death of the last survivor of the beneficiaries the trustee was directed to divide the proceeds among the issue of the above named beneficiaries *per stirpes.* By her will she also bequeathed certain articles of personal property to her sister, and to her nieces, Mary L. Moore, Meta A. Chamberland, Julia E. Stahl and Hazel M. Ault. She named her brother John executor of the will. The will further provides that if any of the devisees or legatees should resist the probate of the will or contest its validity, he or she so doing should not have any part of her estate under the will or under the laws of descent. She did not dispose of her one-fourth interest in the 65-acre tract.

After the will had been admitted to probate Frank M. Grosh, plaintiff in error, filed his bill in the circuit court of Macon county to set aside the probate of it and to contest its validity on the ground of mental incapacity of the testatrix and undue influence of her brother Henry in the execution of it. All of the devisees and legatees and the executor were made parties defendant. The defendants Henry O. and John W. Acom and Hazel M. Ault answered the bill. A guardian *ad litem* was appointed and answered for the infant defendants. The other adult defendants defaulted and the bill was taken as confessed against them. Replications were filed and issues of fact were formed on the questions of sound mind and memory of the testatrix and undue influence of Henry O. Acom. The issues were submitted to a jury at the October term, 1922, of said court and the jury failed to agree. The cause was again heard at the October term, 1923. At the close of the evidence the court directed a verdict in favor of the proponents on the issue of undue influence. The jury returned a verdict for the proponents on the other issue of fact. A decree was entered thereon finding that the proposed will was the will of the testatrix, and the bill was dismissed for want of

equity. Frank M. Grosh has sued out this writ of error to review the record.

The testatrix had never been married and had lived all her life on the farm devised to her two brothers. She had lived there with her parents until their death, and thereafter with her brother Henry. She managed the household affairs and with the assistance of a woman servant had done a woman's part of the farmwork. She superintended the raising of the chickens, marketed the butter, eggs and poultry and attended to the buying and procuring of the groceries and other household necessaries. She generally transacted her own business affairs but occasionally consulted her brother Henry, who managed the farming operations. He married the woman servant, and thereafter the three lived together on the farm until the death of the testatrix. The east 80 acres of the farm devised to her brother Henry was improved with new buildings and was more valuable than the west 80-acre tract devised to her brother John.

Thirty-six witnesses testified for the proponents of the will. One of those witnesses, a deputy county clerk, by his testimony identified the will and affidavits of the subscribing witnesses as a part of the files of the county court in which the will was admitted to probate. Another expert witness testified, in rebuttal of contestant's evidence, as to the effects of the various diseases and complications that proponents' witnesses testified testatrix had.

Dr. J. A. W. Mayes, of Illiopolis, testified as an expert witness in substance as follows: He had known the testatrix for thirty or forty years and had treated her as her physician for five years immediately preceding her death. She had some hardening of the arteries and a mild nephritis— a form of Bright's disease. He discovered only a trace of albumen in her urine and did not treat her continuously for kidney trouble because he did not consider it severe enough. Her blood pressure was normal, and she had a slight en-

largement of the heart, which made her weak and nervous at times, causing an asthmatic condition. He treated her for indigestion, nervousness and the asthmatic condition throughout the time he attended her, which were caused by said complications. He last called on her just a few hours before her death. She died of uremic poisoning, which was caused or influenced by her kidney trouble. During his social and professional acquaintance with her he talked with her about a great many subjects and during the last five years of her life he did not observe any mental derangement. It was his opinion that at the time she made the will she was of sound mind and memory.

Dr. Corwin S. Mayes, son of Dr. J. A. W. Mayes, testified that the testatrix had cardiac nephritis and cardiac asthma, which conditions had existed seven or eight years. He had known her for fifteen years, and had treated her professionally since he returned from the war, in 1919, two or three times a week until her death. He described her ailments and conditions substantially as had his father in his testimony. He did notice a slight difference in her mental condition at the time he first met her as a citizen as compared to her condition when he began treating her, but it was so slight he did not treat her for it. During his professional visits she talked to him about Queen Victoria, the war, the early history of Illinois and other commonplace subjects. He did not have occasion to see her about the time the will was made and could not say what was her condition of mind at that time, but that from what he had observed up to the time of her death he was of the opinion that she had been of sound mind and memory as long as he had known her and at the time of her death. In arriving at that conclusion he had taken into consideration her physical ailments and her general condition.

Thirty-two of proponents' witnesses were persons who had been acquainted with the testatrix from ten to thirty years and who had met her frequently and talked with her.

Some of those witnesses were neighbors to her, others were associated with her in church work, many of them were merchants in the neighboring towns, and others were persons with whom she had had business transactions. All of those witnesses, except four or five, had seen and talked with her within the last eight months of her life and some of them had visited her at her home shortly before her death. Some of them had been friendly with her for the last ten years or more of her life. In the conversations she had with them she talked about the events that had occurred in her community, about the people who had lived there, about chickens, cooking, housekeeping, charitable work, the war, knitting for the soldiers, subscriptions for Liberty bonds, early history of the community and about people who had lived in it. Her parents had come from England and she was much interested in that country. She read history and discussed it, and she was specially interested in the reign of Queen Victoria. She had a nephew in the English army who was wounded, about whom she talked a great deal. She had many magazines and newspapers in her home and her callers often found her reading them. She attended meetings of the Missionary Society and Ladies' Aid of her church, and although she did not take a place on the special program at any of such meetings, she took part in the general discussions that arose. She did most of her trading at Niantic and Illiopolis. The merchants with whom she traded testified that she usually came alone to their places of business and brought poultry and eggs and exchanged them for such articles as she desired. She always knew what she wanted, and at the conclusion of her transactions if the balance was against her she paid it in cash or by check. She was not different from the ordinary customer. She met her friends and acquaintances in the stores and talked with them on the usual topics incident to such occasions. Two hucksters who called at her home and exchanged their wares and merchandise for

her poultry and eggs, stated that she made calculations as
to the result of their mutual transactions and that her fig-
ures were generally correct. She could calculate the trans-
actions in her mind faster than they could with pencil and
paper. They considered her a woman above ordinary per-
sons in intelligence. She loaned one of her merchants $1000
and gave him her check for that amount. This transaction
occurred about five years before her death. She held a
mortgage on a lot that one of the witnesses was about to
buy. The mortgage was not due, and the witness, just be-
fore completing the purchase, asked her if the mortgage
could be extended if he purchased the lot. She replied that
the mortgage could stand as long as he paid the interest.
He bought the lot and afterwards tried to sell it to her, but
she declined to buy it. Another witness in 1917 called at
her home to borrow $1700 from her brother. Her brother
was not there and she asked the witness what security he
could give. When he informed her about the security she
told him she thought her brother did not have that amount
of money but that she and her brother together could make
the loan. Later the loan was made and she gave her check
for her part and the brother gave a check for his part of
the loan and the note was made payable to her. This wit-
ness had known her for a good many years and had been
in her home on numerous occasions. He stated that she
was a bright woman for her age and that her mind seemed
to be very good. Another witness had borrowed $300 from
her. He had known her for a long time and was then a
member of the school board. The school house was located
on her land. The school board had decided to install a
furnace in the school building, and when she heard of this
she requested him, as a member of the board, to take up
with the board the matter of moving the house to the cor-
ner of her land before installing the furnace. She proposed
that if the board would do that she would pay part of the
expense for the moving and would give the land to the

325—31

school district for a location, reserving twenty-five feet for a roadway for an outlet for her farm. She gave as her reason for desiring the school house moved that it was in the center of her farm and she was compelled to farm on three sides of it, but if the location were changed she would only farm on two sides of it, reserve twenty-five feet for a road and save herself the trouble she had in getting to her house. On one occasion when some people were hunting on her farm and came near her house she ordered them to get off her land and to cease hunting there. They informed her they had permission of her brother Henry. She replied that it made no difference and that what she said must settle the matter. In 1915, 1916 and 1917 a Methodist clergyman solicited her for contributions to the Illinois Woman's College, at Jacksonville. They talked about what the college was doing in the way of training girls in the domestic arts and science, and she inquired about the teachers and the special department of domestic arts and science as it was taught in the school. She told him she did not want to give donations to any person or institution that did not train women from her standpoint of being womanly. She made a contribution of $500 in 1915 or 1916. In 1917 he solicited her for funds, telling her the work the college was doing for students from France and South America. She inquired particularly about the character of those students and whether the college was fitting them for domestic life or for teachers. She expressed the opinion that more real homes were needed with women who would be homemakers. He saw her again in 1919 and solicited another contribution. The conditions in Europe were discussed. She made no further contribution, saying that there were as many girls in America who needed training as there were in France. He stated that she was familiar with English and French history, and that she made intelligent references to the Literary Digest, the Woman's Companion, the Woman's Home Journal and some farm papers which

were in her home. Another witness lived on a farm with
his parents, about 200 yards from her home, from 1912 to
1918. His father came from England and worked for the
Acoms before he brought his family to this country. The
witness was eleven years old when he came to this country.
He did the chores for the testatrix until he was seventeen
years of age and was in her home daily during that period.
She talked to him about England, the war, the advance and
retreat of the armies from time to time, the Red Cross work
and about going to school, and insisted that he should at-
tend school. She sent books to his sister by him, such
as David Copperfield, the Tale of Two Cities, and Oliver
Twist, and recommended them as good books for him to
read. He saw her read English history. In May or June,
1920, he saw her in Decatur and told her of his marriage,
and she congratulated him. He inquired how she was get-
ting along, and she replied, "Fine." On one occasion she
seemed to be worried and he asked her what was the mat-
ter. She told him of a rumor to the effect that Frank
Grosh, her nephew, was going to leave his wife, and stated
to him that she was going to arrange it so that Frank could
not "fool away" any of her property. One of the witnesses
at whose home the testatrix had frequently visited, testified
that during her visits she talked about different topics of
the day, on such matters as women generally discuss. She
stated that the testatrix did not talk any more on one topic
than others and that when she started a subject she went
through with it. All of the thirty-two witnesses for pro-
ponents testified that in their opinion she was of sound
mind and memory, and that during the time they had
known, observed and associated with her there was no
change in her mental condition, other than the normal
change incident to increasing age.

Proponents also introduced in evidence about ninety-
five bank checks bearing the signature of testatrix. One
of the checks was not signed but was paid at the bank. In

two of the checks the amount written in figures did not
exactly correspond with the amount written in the body of
the checks, the difference being in the amount of cents. The
signature to one of the checks was not written by her. In
other respects the checks are not different from ordinary
bank checks. They cover the period of time from 1911 to
the spring and summer of 1920. They range in amount
from a few cents to $2200 and apparently cover a wide
range of transactions. They also introduced some twenty
or twenty-five Christmas and Easter cards and other cards
of that character, bearing the signature of testatrix and ad-
dressed to her friends and acquaintances.

Three physicians and two laymen testified on behalf of
the contestant substantially as follows:

Dr. Ellen F. Grimes: She is a graduate in medicine
of the Women's Medical College of Pennsylvania, is located
in Decatur and confines her practice to chronic troubles of
women. In 1885 the mother of the testatrix brought her
to her office in Decatur for treatment. She has known
the testatrix from that time to 1919. She treated her for
simple ailments up to 1914 but never treated her for any
organic trouble. She did not treat her after 1914 but the
testatrix occasionally called at her office on social visits.
On her first visit to her, in 1885, she had trouble in getting
her patient's history and condition. She was inexact in her
replies to questions concerning her ailments. Her replies
were not responsive to the questions, and it was only with
the assistance of her mother that she could gain any infor-
mation of her condition. She observed that the testatrix
was very submissive to her mother. She was amiable, quiet
and not aggressive in any way. She read a great deal
about things that did not interest the doctor and told her
about them. She carried on a connected conversation, but
when she was asked questions her answers would be eva-
sive and not direct. During the social calls she talked about
all she came to town to buy, what she paid for the things

she bought and what she wanted at home. She was not positive of anything. She bought things and would sometimes take them back. The last time she saw the testatrix was in 1919, when she made a social visit. She noticed that the testatrix was feeble and suffering from heart trouble. She was short of breath. The doctor examined her pulse and told her she ought not to come to Decatur alone and that she might fall and have an accident. As she grew older her inexactness became more pronounced. In the witness' opinion the testatrix was congenitally mentally subnormal and in 1919 was not of sound mind and memory.

Dr. Josephine Hartwig: She is an osteopathic surgeon, practicing in Decatur. She began treating testatrix in 1917 and continued to treat her until a year prior to her death. She had arteriosclerosis, Bright's disease, an enlarged heart and senile dementia. She was forgetful and had difficulty in the articulation of words. Her answers to questions were not responsive. In conversation she passed rapidly from one subject to another without having finished the subject on which she was talking, and her condition in that respect grew worse. At times she would continue to talk when she (the doctor) had left the room. She failed to keep her appointments with the doctor and came at times when she had no appointment. Sometimes she offered to pay the doctor after she had already paid her. She talked a great deal about English history and Queen Victoria, and her talk in that respect was intelligent, "so far as I know." In her opinion the testatrix was of unsound mind and memory.

Dr. Alonzo Hall: He is a practicing physician in Niantic. He had known testatrix all his life and had treated her professionally for bronchitis and stomach trouble, "such as we all have," for twenty years prior to her death but did not treat her in 1920. He examined her urine about seven years before her death and found it normal. She had arteriosclerosis, and had senile dementia the last two

years of her life.   Arteriosclerosis is noticeable in practically every person after reaching the age of fifty years. Nothing can be done for it, and the testatrix did not have it to such an extent that he considered it necessary to take her blood pressure.   It affects the heart and makes more work for it.   It possibly causes an enlargement of the heart.   It also affects the brain.   When the brain is poorly nourished, as it would be, it is sluggish and not as active as it should be.   Senile dementia is an inactive condition of the brain.   He received his pay for his services, usually from her brother Henry.   He remembered that she paid him a time or two for such services.   When Henry paid him he would bring a check signed by the testatrix in blank. Henry would then insert in the check the amount of the bill when he ascertained it.   From his knowledge of the testatrix, obtained by his visits and his treatment of her, he gave it as his opinion that she was not a person of sound mind during the last two years of her life.   He would not say that she was insane.   When he first saw her she was a woman of sound mind, with peculiarities.

Theodore Mott:   Is a car repairer, living at Clinton, Illinois.   He moved on the farm of testatrix in 1918 and left there in 1920.   He lived 250 yards from her home.   He was employed by her brother to work on the farm the first year that he was there.   The next year he rented part of the farm and farmed it on shares.   All his transactions were with her brother Henry.   He wanted to rent the farm for the year 1920 but they refused to let him have the land.   He has as friendly feeling for them now as on the day he first went to their farm.   She was a peculiar woman, having "a far-away look."   She had a nervous, jerky walk. Her eyes had a staring, glassy appearance at all' times. She walked around from place to place, being in one place one minute and in the next minute "somewhere else."   She walked about the farm alone and talked to herself.   She would talk on a subject and immediately change the sub-

ject to something else. He had seen her go to sleep with a newspaper in her hand. In November, 1918, he went to Niantic and registered for service in the war. She asked him if he was going to call for exemption. He replied that he was not going to ask for exemption. She told him that her brother Henry would try to help him out if he wanted to apply for exemption. He was of the opinion that she was of unsound mind and memory.

Henry Bruce: He is a nephew of the testatrix. He and his mother visited her on Thanksgiving in 1917 and had dinner with her. She talked with him about a trip he had taken out west and during the conversation she fell asleep. He had never before noticed her falling asleep during a conversation. He noticed that she could not exert herself "without getting out of breath." In 1918 he went to her home and talked with her about signing a petition for a road. She told him that whatever her brother Henry wanted to do about it would be satisfactory to her, but that neither of them signed the petition. Afterwards he went to see her about a contract concerning the road. While her brother Henry was reading the contract aloud she talked to him about his children. Finally Henry stopped reading, and after reading the contract to himself told her to sign it, and she signed it. He stated that he had been helping Frank Grosh to find people to testify that she was crazy and that he wanted to see her will broken. He did not ask anybody to testify that she was crazy. He was of the opinion that she was not of sound mind and memory.

Dr. Frank P. Norbury: He is an expert on mental and nervous diseases and for five years conducted an institution for the treatment of such diseases at Jacksonville and was also connected with other similar institutions. He gave it as his opinion that she was a congenital subnormal and that her intelligent age was less than that of a child twelve years old; that the history of her mental condition as disclosed by the hypothetical question showed that it was consistent

with arteriosclerosis and in keeping with progressive arteriosclerosis, the tendency of which is to produce senile dementia; that it would.make no difference, in his opinion, that the person in question during the last six or seven years of her life was able to go about and be able to recall events concerning persons she had known in her earlier life, that she read the newspapers and took an interest in the World War that was waged during the later years of her life, or that it was possible for her to transact business, to recognize and inquire about relatives, to make purchases, to make contributions, and to do other things of similar nature. His testimony was based upon a hypothetical question which assumed, among other things, that the testatrix was a person of congenital mental inferiority, had arteriosclerosis, senile dementia, Bright's disease and heart trouble. It also assumed that her brother had for a number of years assisted her in the management of her farm, writing checks and notes for her, and was present and taking part in business transactions had with her.

Plaintiff in error also introduced in evidence six bank checks, one bearing the name of the 'testatrix. This check was drawn on the bank at Niantic, and an officer of the bank at Illiopolis, in which she had a checking account, testified that he did not know the handwriting in the signature but thought it was that of her brother Henry. The other five checks were signed "Sarah E. Acom by Henry O. Acom." The first check, for $25, was dated January 18, 1919. Three of the other checks were for $6, $100 and $348, and were dated July 11, 1914, September 30, 1918, and March 4, 1919, respectively. The other two checks were for $11.20 and $4.15, and were dated February 13, 1920, and March 13, 1920, respectively.

The court did not err, as contended by plaintiff in error, in directing a verdict in favor of the proponents on the issue of undue influence and in refusing to instruct the jury on that issue. The evidence tends to prove a fiduciary re-

lation in some business transactions in which Henry O. Acom acted for the testatrix, but there is no evidence tending to prove that he had anything whatever to do with the preparation or the execution of the will. The proof, in fact, shows that the testatrix went alone with the will to the bank, where she signed it, published it and had it attested. There is no evidence to show who drafted it for her or that Henry was with her when it was drafted and executed. Evidence merely tending to prove a fiduciary relation is not sufficient to entitle a contestant to have the question of undue influence submitted to the jury. Such evidence does not create the presumption of undue influence unless it is further shown that the fiduciary relation is used for the purpose of procuring the making of the will. Undue influence that will invalidate a will must be of such character as to deprive the testator of free agency, be directly connected with the execution of the instrument and be operating at the time it is made, producing a perversion of the mind that made the will. (*Chaney* v. *Baker*, 304 Ill. 362; *Farmer* v. *Davis*, 289 id. 392; *Waterman* v. *Hall*, 291 id. 304.) There is no proof in this record that can be said to show or tend to show a deprivation of the testatrix's free agency in the making of her will. We do not think that it even tends to show such a deprivation of her will in any other matters, and we have heretofore held that undue influence in any transactions other than the one of the execution of the will is immaterial and insufficient to avoid the will. (*Waterman* v. *Hall, supra.*) It is true that in a will contest case undue influence may be proved by circumstances, and that the more feeble the testatrix may be in mind and body the less evidence will be required to establish such influence. Nevertheless, the proof in this record cannot be said to go to the extent of showing that the will is the offspring of Henry O. Acom's will and is not the will of the testatrix. Neither the will itself nor the evidence in the record supports such a charge, and the court

properly took that issue from the jury. *Blackhurst* v. *James,* 304 Ill. 586; *Waterman* v. *Hall, supra.*

The court did not err in admitting in evidence the certificate of the oath of the attesting witnesses made by them on the probate of the will. The objection seems to be that it contains the statement that the testatrix was "under no constraint at the time she signed, sealed and acknowledged the same as and for her last will and testament." The only objection made to its introduction was that no proper foundation had been laid. The witnesses properly identified the certificate and testified to the signatures. This testimony, with the clerk's certificate of the oath, was sufficient to render it admissible over the general objection. The certificate is made competent evidence by section 7 of the statute on wills, and in *Baker* v. *Baker,* 202 Ill. 595, this court held that it is competent.

The contestant also argues that the court erred in its rulings on the admissibility of evidence offered against him, and also in excluding certain evidence offered by him. An examination of such rulings of the court in the record discloses no reversible error. The contestant has had the advantage of all the testimony to which he was entitled that was properly offered by him. Some of the questions propounded by him were leading. By other questions he sought the conclusions of the witnesses and not the facts, and thereby sought to invade the province of the jury. Other objections to the court's rulings are not properly saved by him in the record by stating to the court to what the witnesses would have testified if they had been allowed by the court to answer the questions.

The contestant further insists that the court committed reversible error in the matter of giving instructions to the jury on behalf of the proponents and also in the matter of refusing to give to the jury certain instructions offered by him. It is the law of this State that the burden of proof is on the proponents in a case to contest a will, and that in

such a contest they must establish the will as the last will and testament of the testator by a preponderance of all the evidence in the case. This court has frequently so held. We have also held that the burden of proof never shifts during the course of the trial but remains with the proponents to the end. The burden of introducing evidence may, and does, shift to the contestant during the course of the trial, but the burden of proof, in the sense of the obligation to establish the truth of the claim that the will is the will of the testator by a preponderance of the evidence, rests throughout the trial upon the proponents, who are the parties asserting the affirmative of the issue. (*Sellers* v. *Kincaid,* 303 Ill. 216; *Donovan* v. *St. Joseph's Home,* 295 id. 125.) In the *Donovan case* just cited it was held, after it was stated very concisely and accurately what constituted a *prima facie* case for the proponents in such a contest, that it is the duty of the proponents of a will to offer in chief not only the evidence making a *prima facie* case, but all other evidence they have relating to the issue of testamentary capacity. It was also there held that it is the presumption of the law that all adults are of sound mind until the contrary is proven, and that the law throws the weight of this legal presumption in favor of sanity into the scale in favor of the proponents, as sanity is the rule and insanity the exception.

The contention of the contestant is that the instructions relating to the burden of proof and as to the facts required to be proved by the proponents to establish the sanity of the testatrix and that the will was her will were so inaccurate as to mislead the jury and to cause them to return a verdict which they would not have returned if the instructions had been accurate. The court made it clear by its instructions that the only issue to be decided by the jury was the one of sound mind and memory of the testatrix, and that sound mind and memory, within the meaning of the law, is as defined by the court's instructions. By the

ninth instruction the court told the jury that a person of sound mind and memory in making a will has the right to make it as he sees fit; that he has a right to prefer one relative or object of his bounty over another, or to make an inequality in the distribution of his property, or to exclude one or more of his relatives in any distribution he may see fit to make, without assigning any cause and without any cause being shown therefor. The court then told the jury in this instruction that "if you believe from the preponderance of all the evidence that the testatrix, Sarah E. Acom, at the time of making said will had sufficient mind and memory to know, understand and appreciate the objects of her bounty and the way or manner in which she wished to dispose of her property by testamentary disposition in her will and that she then had sufficient mind and memory to know the nature and amount of her property and the nature and effect of her will, she had the legal right to make such distribution as she saw fit." By the thirteenth and fourteenth instructions the court in substance informed the jury that the testatrix had sufficient mind and memory to make a will and that the will in question was valid if at the time she made it she had sufficient mind and memory to know and understand who her kindred were or who were the natural objects of her bounty, to recall to mind all her property and to make disposition of it understandingly according to purposes or plans formed in her mind, understood the particular business in which she was then engaged and the nature of her act and the effect of her will. These two instructions as to what constitutes mind and memory sound enough to make a will are in harmony with the holding of this court in the case of *Donovan* v. *St. Joseph's Home, supra.* The court gave other instructions similar to instructions 13 and 14, but they did not recite all the things enumerated in instructions 13 and 14 which the testator must know and understand in order to make a valid will; but the contestant cannot complain of

such instructions because he also offered instructions of the same character that were defective in the same particulars.

The court gave for the contestant instruction No. 7, telling the jury in positive terms that the burden of proof in this case was upon the parties asserting the sufficiency of the will, and that they were required to prove that at the time of its execution the testatrix was of sound mind and memory within the meaning of the law as explained in the instructions given to them.

We have examined the instructions found in the record that were given to the jury, nineteen for the proponents and sixteen for the contestant. While several of those given for the proponents and several for the contestant are faulty and some of them inaccurate, yet when taken as a series we do not think there is anything in them that should be regarded as reversible error in this case. It is not to be understood that this court approves the giving of proponents' instructions Nos. 16 and 18, or that we would approve any instructions of like character in any case where there is a contest and a number of witnesses examined on each side testify to matters relating to the issue of testamentary capacity to make a will. In proponents' instruction No. 18 the court told the jury, in substance, that when the proponents of the will introduced in evidence the certificate of the oath of the subscribing witnesses to the will such certificate was *prima facie* proof of the validity of the will, and that it then became the duty of the contestant, on the issue of mental capacity of the testatrix, to substantiate the charge made in the bill that she was not of sound mind and memory when she signed the paper purporting to be her will. The instruction further informed the jury that they had a right to consider the evidence offered to establish the testamentary capacity of the testatrix after the *prima facie* proof was made and the evidence of the contestant offered to show that she was not of sound mind and memory, and that if, from a consideration of the

evidence in the record, they believe "that the evidence pre-ponderated in favor of the proponents of the will, then and in such case it would be the duty of the jury to find on such issue" that the will in question was the last will and testament of the testator. Instruction No. 16 is of simi-lar character.

The necessary effect of giving such instructions as pro-ponents' instructions Nos. 16 and 18 is to confuse the jury. This was not a case in which only a *prima facie* case was made by the proof aforesaid, and the jury should not have been instructed at all as to what constituted a *prima facie* case. The question for the jury to decide, and the only question, was whether or not the proponents had estab-lished, by the greater weight of the evidence, that the tes-tatrix was possessed of mind and memory sound enough, at the time she executed the instrument in question, to make a will and that the instrument in question was her last will and testament. It was proper to tell the jury in a proper manner that the clerk's certificate of the oath of the attesting witnesses was competent evidence in the case and that it was their duty to consider it with all the other evi-dence in passing on the issues. The jury were not con-cerned with and were not enlightened by telling them what constituted a *prima facie* case, and that after it was made and further evidence was introduced by the proponents the burden or duty of introducing further evidence shifted to the contestant, etc. It was also proper to tell the jury in an instruction that all men and women are presumed to be of sound mind and memory until the contrary is shown. If the only evidence introduced in the case had been the evi-dence which makes a *prima facie* case, instructions as to what makes a *prima facie* case would have been very proper and necessary if a jury had been impaneled to try the case, but that is not the case here made.

Whether or not errors in a record in the matter of giv-ing instructions or otherwise are reversible errors must nec-

essarily depend upon the character and amount of proof in the record tending to support the finding and judgment of the court and the amount and character of the evidence *contra.* The evidence in this record, as we view it, tending to show that the testatrix was of sound mind and memory within the meaning of the law. and that she was competent to make a will, makes a very strong case for the proponents. We do not see how a jury properly instructed in every particular could consistently render any other verdict in this case than the verdict that has been rendered, after fully and fairly considering all the evidence in the record. It is true that the evidence for the proponents does not establish the fact that the testatrix had a mind and memory that were perfectly sound in every particular. It was not necessary at all that the evidence should so show. It is also true that the evidence introduced for the contestant tends to show that she was of unsound mind and memory at the time she made the will, but when all the evidence in the record is considered and weighed we have no doubt that the testatrix's mind and memory were sound enough at the time she made the will for the purpose of making a valid will within the meaning of the law. When we say this we say it without intending to cast doubt on the truthfulness of any of the contestant's witnesses in the case. The law recognizes it as a fact that a person may be of unsound mind and memory to some extent and still be competent to make a valid will.

We have set out substantially the evidence in the record. This evidence speaks for itself and requires no argument to show that it is convincing, when all of it is considered, that the testatrix had the capacity to make the will in question. We do not think that either the will itself or the evidence necessarily shows that she had any undue prejudice toward the contestant because of the rumor that he had deserted or left his wife or that the fact that she gave credit to the rumor tended to show unsoundness of

mind. The clause in her will that provided that the legacies bequeathed to him and his brother and sister should constitute a trust fund to be handled, as therein provided, by their uncle, discloses that by her will she did intelligently just what she told one of the proponents' witnesses she intended to do—so arrange her will that he could not "fool away" any of her property. She probably had in mind that the provision made for him might inure to the benefit of his wife as the result of litigation. It also shows that she considered that not only the contestant, but also his brother and sister, needed or required the benefit of such a trust fund to insure them the ultimate benefit of the property she bequeathed to them. The further provisions of the testatrix that her brother John should be the executor of the will without bond and the trustee of the trust fund tend to show that the will was her will and not the offspring of the will of her brother Henry, and that by the execution of the will she did what she intended to do and that she understood and appreciated the matter in hand when she was making the will. It seems to us that there can be no doubt, after considering the will and all the evidence in the record, that the mind and memory of the testatrix were sufficiently sound to execute a valid will when measured by the standard aforesaid. The evidence really shows that the testatrix was above the average citizen in intelligence. She had peculiarities. She was a native of England, and she was possessed of many of the traits of English men and women which we are sometimes prone to call peculiar. At the time she executed her will she was affected by the various diseases and complications testified to in the record, and she was weaker—much weaker—in body and mind than she was five years or more previous to her death. But all the evidence, including the will itself, undoubtedly shows that she knew and comprehended the property that she had when she undertook to make her will, knew that she was making her will and understood how she wanted it made,

knew and remembered all her near relatives and distributed her property among them, and knew what would be the effect of the will upon them.

There is no reversible error in the record, and the decree of the circuit court is affirmed.        *Decree affirmed.*