TEBA ANLICKER *et al.* Appellants, *vs.* LAMMERT S. BRETH-
ORST *et al.* Appellees.

*Opinion filed February 24, 1928.*

1. WILLS—*witness may be cross-examined as to the testator's
knowledge of his property.* A banker who has testified for pro-
ponents of the will in regard to the testator's mental capacity and
has testified to a conversation with the testator when the latter was
seeking a loan on a portion of his land two months before the
will was executed, may be asked on cross-examination whether the
testator told him how much land he owned at that time, where
the written application for the loan shows either that the testator
greatly over-estimated the value of his property or mis-stated the
amount thereof.

2. SAME—*when witness may be cross-examined as to effect of
an insane delusion—instruction.* Where a will is contested on the
ground of mental incapacity of the testator, a witness for the pro-
ponents who admits that the testator, when talking to him about
making his will, told him that two of his daughters had kidnapped
him, may be asked on cross-examination whether the testator said
anything about what he was going to do in his will about his daugh-
ters, where the alleged kidnapping is claimed to be an insane de-
lusion, as an insane delusion of the testator in regard to the natu-
ral objects of his bounty is important on the question of his testa-
mentary capacity, and in such a case the contestants are entitled to

an instruction that if the testator was laboring under an insane delusion in regard to the natural objects of his bounty, which affected the disposition of his property, the jury should find against the will.

3. SAME—*when instruction as to time of testator's mental capacity is improper.* An instruction stating that if the testator was of sound mind and memory at the time he executed the will it is wholly immaterial what the jury may believe as to his soundness of mind at any other time should not be given, as the jury is entitled to consider the condition of the testator's mind a reasonable time before and after the execution of the will, and the instruction tends to confine the jury to the consideration of the testimony of the attesting witnesses and to only those who had access to the testator at the moment he executed the will, when, as in most cases, the contestants were not present.

4. SAME—*when instruction as to prima facie case of validity of will is improper.* In a will contest proceeding an instruction that the purported will itself, together with the affidavit of the attesting witnesses in evidence, makes a *prima facie* case in favor of the validity of the will should not be given, as the oath of the attesting witnesses, under section 2 of the Wills statute, has only such weight as the jury thinks it deserves, and where contradictory evidence is introduced the case must be decided on the consideration of the whole evidence, and under such circumstances an instruction as to what constitutes a *prima facie* case does not enlighten the jury.

5. SAME—*when contestants' instruction as to mental incapacity should not be refused.* An offered instruction stating that if the jury find the testator was of unsound mind in regard to subjects connected with the testamentary disposition of his property and the natural objects of his bounty and that such condition of his mind affected the disposition made by the will the jury must find against the will even though the testator may have had sufficient mental capacity to attend to ordinary business affairs, should not be refused although it fails to require the finding of unsoundness of mind to be based upon a preponderance of the evidence, where instructions given for the proponents require such basis for the jury's findings.

6. SAME—*bill to contest a will need not specify nature of mental incapacity.* A bill to contest a will on the grounds of want of testatmentary capacity and unsoundness of mind need not specifically name the particular kind of unsoundness of mind nor the cause of mental unsoundness, as such matters pertain to the evidence and need not be alleged.

7. SAME—*when refused instruction as to insane delusions does not require too high degree of mental capacity.* In a will contest

case a refused instruction requiring the jury to find against the will if they believe the testator, when he made his will, was laboring under insane delusions upon subjects connected with the testamentary disposition of his property and the natural objects of his bounty and was thereby rendered incompetent "to apprehend, rationally, the nature and effect of the act," and that but for such delusions he would not have made the will as he did, does not require too high a degree of mental capacity, as the law requires a testator to know what he is doing, what property he has, who are the natural objects of his bounty and what disposition he wants to make of his property, and the quoted words of the instruction do not mean that he must understand the consequences or probable result of his making the particular will.

APPEAL from the Circuit Court of Ford county; the Hon. FRANK LINDLEY, Judge, presiding.

SCHNEIDER & SCHNEIDER, for appellants.

M. L. McQUISTON, guardian *ad litem,* F. M. THOMPSON, and HALL, MARTIN, HOOSE & DEPEW, for appellees.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This appeal is from a decree of the circuit court of Ford county entered on a verdict of a jury sustaining the will of Seipt L. Von Brethorst, which disposed of real and personal property located in Ford county and owned by testator at the time of his death and confirmed a deed theretofore made.

Testator was born in Germany on November 16, 1835, and came to this country in 1866. He attended school in Germany until he was eighteen years old. When he reached Illinois he was without capital and took employment as a farmhand. He married and raised five children, four of whom survive him. He is also survived by two grandsons, sons of a deceased daughter. He accumulated a half-section of land in Ford county and about $5000 in money and personal property. His wife died in 1921 and he employed his

grand-daughters to keep house for him. May 25, 1925, he executed the will in question and died in October of the same year. By his will he confirmed a deed dated May 15, 1925, conveying 120 acres of land to his son, Lammert, and gave 80 acres of land to his daughter Anna Baumann, 80 acres of land to his grandsons, Leslie and Raymond Walters, and 40 acres of land to his daughters Teba Anlicker and Margaret Brucker as tenants in common. The will was prepared at his home in Sibley by an attorney from Paxton, and was witnessed by his brother, two of his nephews and a son-in-law of Lammert. The daughters Teba and Margaret filed the bill to contest the will on the ground that he was mentally incapable of executing a will on May 25, 1925, and that the will was the result of the undue influence of Lammert.

Dr. Albert A. Absher, who lived about a block from testator and was his family physician, testified that he had known testator for thirty years; that he was called to treat him March 10, 1925, and found him suffering from chronic myocarditis, arteriosclerosis and thrombosis; that these diseases affect the blood supply to the brain and cause a mental ailment known as senile dementia; that he called on him regularly until the last day of April and that he gradually grew weaker; that he saw him again in September; that when his last illness set in, in March, he weighed about 160 pounds and that when he saw him in September he weighed only 100 pounds. He expressed the opinion that testator was not of sound mind and memory during the last nine months of his life.

Seven other witnesses testify to facts showing that testator was senile and was suffering from insane delusions with respect to contestants. His daughter Teba took him to her home in April, 1925, and cared for him about three weeks. He got the notion that he had been kidnapped by his daughters Teba and Margaret and developed a hatred of them. There was no foundation for this notion. Other

witnesses testify that he would complain that the weather was stormy when the sun was shining brightly; that he said the decorations on the wall-paper were green blood-stains; that when his son-in-law Pearl Brucker told him that his little girl had been caught in an engine and had barely escaped death he flew into a rage and asked why they were suing him for damages when he had not injured the little girl; that he entertained the notion that Brucker had stolen his chickens; that his dog died in November, 1924, and thereafter he placed dishes of food upon the kitchen floor and complained that his dog would not come and eat; that he flayed an imaginary devil with an imaginary iron rod in his hand; that he refused to take his medicine and insisted that his family physician was trying to poison him; that he got the notion in April, 1925, that he was dead and insisted that he saw the local undertaker and his hearse coming to get him; and that he entertained many other delusions of a diseased mind. Three of the witnesses were the children of Teba Anlicker, and the other four were a grocer, a banker, a grain dealer and a neighbor who lived across the street from testator and visited him three or four times during a week.

Proponents produced thirteen witnesses who had been acquainted with testator many years and had transacted business with him. Seven of these witnesses were relatives, four of them being the subscribing witnesses to the will, two of them daughters of Lammert, and the seventh a brother-in-law. The other six witnesses were a practicing physician, a former sheriff, a farmer, a banker, a carpenter, and an acquaintance from Peoria. Three of these witnesses testified that testator had told them that his daughters had kidnapped him. All of these witnesses expressed the opinion that he was of sound mind and memory at the time the will was executed.

Testator was nearly ninety years old when he executed the will in question and had been a sick man for several

weeks. The evidence is conflicting and no useful purpose will be served by setting out the testimony of the several witnesses in detail. As far as the determination of this case is concerned, such a discussion would lead only to the conclusion that the evidence on either side, in the absence of countervailing evidence, would sustain a verdict in favor of that side, and under such circumstances it is important that the trial be free from serious error in the rulings on the admission and exclusion of evidence and on the giving and refusing of instructions.

March 15, 1925, when testator executed the deed conveying 120 acres of his land to his son he made application for a farm mortgage loan on 160 acres of land. In this application he stated that he owned other real estate of the value of $40,000. The fact was that he owned only 40 acres of land besides the 120 acres deeded to his son and the 160 acres he was pledging to secure the loan. On the cross-examination of the banker who took the application the attorneys for appellants undertook to ascertain whether testator knew at that time how much land he owned, and asked this question: "Did he say to you how much land he owned at that time after this deed was made?" Objection was made that this was not proper cross-examination, and the court sustained the objection. In this the court erred. The banker had related the conversation which he had with testator at the time the application was made, and it was important to contestants to know whether testator was placing a value of $40,000 on 40 acres of unimproved farm land in Ford county or whether he did not know how much land he owned.

Thomas Christenson, a witness for proponents, testified that he had a conversation with testator May 22, 1925, concerning his children, in which the testator told him that his daughters Teba and Margaret had kidnapped him and wanted to have a conservator appointed. On cross-examination he said that testator seemed to be "a little roused up

about the girls" when talking about their kidnapping of him and about making his will. He was then asked this question: "Did he say anything about what he was going to do. in his will about these girls that had kidnapped him?" An objection to this question was sustained. This was error. If the kidnapping was a delusion it was important for contestants to know whether it influenced testator in the making of his will and caused him to discriminate against them.

On behalf of proponents the court gave to the jury the following instruction:

"If the jury believe from the evidence that Seipt L. Von Brethorst at the time he executed the writing in question on May 25, 1925, was of sound mind and memory as defined in these instructions, it is wholly immaterial what you may believe as to his soundness of mind at any other time."

It is true that the time of the execution of the will is the time to judge the testator's mental capacity, and to this extent the instruction is a correct statement of the law, (*Down* v. *Comstock,* 318 Ill. 445,) but an instruction of this character is likely to mislead the jury. (*Miller* v. *Ahrbecker,* 320 Ill. 577.) In determining whether the mind of a testator is sound at the time he executes a will it is important to know the condition of his mind a reasonable length of time before and after. The mental and physical disease from which testator was suffering was not a temporary ailment. It was one of gradual development and it grew progressively worse. At the exact instant of the execution of the will contestants did not have access to him, and, of course, they could not prove by witnesses of their own choosing what his mental state was at that moment. There is danger that such an instruction will be regarded by the jury as a direction not to consider any evidence except that of the attesting witnesses. Under the circumstances it should not have been given.

329—2

The court also gave on behalf of proponents the following instruction:

"The court instructs the jury that the paper in evidence purporting to be the last will and testament of Seipt L. Von Brethorst, together with the affidavit of the two subscribing witnesses in evidence, make a *prima facie* case in favor of the validity of the said paper as the last will and testament of Seipt L. Von Brethorst, deceased."

Section 2 of the statute on wills makes the oath of the subscribing witnesses, taken and reduced to writing and filed in the probate court, competent evidence, but it does not give to this evidence a significance different from that of other evidence of like character. In fact, it specifically provides that the oath shall have only such weight as the jury thinks it deserves. In the absence of contradictory evidence the jury could not disregard this evidence, and its introduction would therefore make a *prima facie* case; (*Britt* v. *Darnell,* 315 Ill. 385;) but that is not the kind of case made here, nor is it likely that a jury will ever be impaneled to try such a case. A *prima facie* case is one which will support a judgment unless other evidence is introduced. When other evidence is introduced the case must be decided on the consideration of the whole evidence, and the jury should not be instructed as to what constitutes a *prima facie* case. (*Grosh* v. *Acom,* 325 Ill. 474.) After all the evidence in this case was in, the jury was not concerned with and was not enlightened by an instruction as to what constituted a *prima facie* case, and such an instruction should not have been given.

The court refused to give, at the request of contestants, the following instruction:

"The court instructs the jury that if you believe from the evidence that, although Seipt L. Von Brethorst had sufficient mental capacity, to attend to the ordinary business affairs of life, yet, that, with regard to subjects connected with the testamentary disposition and distribution of his

property and the natural objects of his bounty, he was of unsound mind; and that while laboring under such conditions, if any, he made the will in question, and that in making it, he was so far influenced or controlled, by such unsoundness of mind, if any, as to be unable, rationally, to comprehend the nature and effect of the provisions of the will, and was thereby led to make the will, as he did make it, then the jury, must find the will not to be the will of the said Seipt L. Von Brethorst."

This instruction is substantially the same as the twelfth instruction approved in *Kimber* v. *Kimber*, 317 Ill. 561. The language and punctuation of the instruction could be improved, but the nature of contestants' case required that some such instruction be given. It was the contention of contestants that testator entertained towards them insane delusions which were acting upon his mind at the time the will was executed and which caused him to grossly discriminate against them. The fact that the instruction does not state that the jury's belief must be "from a preponderance" of the evidence does not render it bad. The twelfth instruction given on behalf of proponents told the jury that the contestants had to establish mental incapacity "by the preponderance or greater weight of all the evidence," and that unless they had proven the averments of their bill as to mental capacity by a preponderance of all the evidence in the case the verdict should be for the proponents. Contestants' instruction No. 1 was to the same effect. It was not necessary to repeat this information in every instruction given to the jury. (*Coulter* v. *Illinois Central Railroad Co.* 264 Ill. 414.) It was error to refuse this instruction.

Complaint is also made of the court's refusal to give the following instruction offered by contestants:

"An insane delusion is a fixed and settled belief in facts not existing, which no rational person would believe; such delusions may sometimes exist as to one or more subjects. And if the jury believe from the evidence in this case, that

Seipt L. Von Brethorst was laboring under insane delusions upon subjects connected with the testamentary disposition of his property and the natural objects of his bounty, when he made the will in question, and was thereby rendered incompetent to apprehend rationally, the nature and effect of the act, and that but for such delusions, he would not have made the will as he did, then the jury should find against the validity of the will."

The refusal to give this instruction amounted to a withdrawal from the consideration of the jury of the question of mental incapacity by reason of insane delusions. Proponents seek to justify the action of the court on the ground that the bill filed contained no allegation to this effect. It was not necessary for the bill to name specifically the particular kind of unsoundness of mind nor the cause of mental unsoundness. These are matters of evidence and need not be alleged. (*American Bible Society* v. *Price,* 115 Ill. 623; *Snell* v. *Weldon,* 243 id. 496.) It is also claimed that the instruction demands too high a degree of capacity in requiring that he have capacity "to apprehend rationally the nature and effect of the act." The law requires a testator to know what he is doing, what property he has, who are the natural objects of his bounty and what disposition he wants to make of his property. This is all the instruction required. It did not require him to understand the consequences or the probable result which would follow the making of the will he executed. It was error to refuse this instruction.

For the reasons given the decree is reversed and the cause is remanded to the circuit court of Ford county.

*Reversed and remanded.*