(No. 18905.—

MARK MADDEN *et al.* Plaintiffs in Error, *vs.* JOSEPH KEY-
SER *et al.* Defendants in Error.

*Opinion filed October 25, 1928.*

GEE & GEE, EMISON & HOOVER, and W. S. WILLHITE,
for plaintiffs in error.

CREIGHTON & THOMAS, and BEN H. TOWNSEND, for
defendants in error.

Mr. Justice Stone delivered the opinion of the court:

This cause is here on writ of error to review the decree of the circuit court of Wabash county sustaining the will of Catherine Keyser and dismissing the bill to set aside the same. The contest is based on two grounds: Want of mental capacity of the testatrix, and undue influence on the part of John E. Keyser, a nephew and chief beneficiary under the will. The bill also charges that the will was not executed according to law, but that ground appears to have been abandoned here. The cause was heard before the chancellor without a jury, and the chief points of plaintiffs in error, who are the grand-nephews and grand-nieces of the testatrix, are, that the chancellor erred in finding that the testatrix was of sound mind and memory, and that the finding that the will was executed freely and without undue influence on the part of the defendant in error John E. Keyser was contrary to the manifest weight of the evidence.

Catherine Keyser, a spinster, died December 8, 1926, at the age of seventy-five years. On October 23, 1926, the will in question was executed. After directing the payment of funeral expenses and debts it gave legacies of $100 each to two churches,—one at Mt. Carmel, Illinois, and one at Terre Haute, Indiana, of the latter of which she was a member,—to a hospital, and to certain priests of the Catholic church for the reading of masses. It directed that a monument to cost not less than $500 be erected at her grave. By the eighth clause of the will she gave the residue of her estate, both real and personal, to her nephew, John E. Keyser, and appointed him executor. She left her surviving as her heirs, Joseph Keyser, John's father and the brother of the testatrix, and plaintiffs in error, her grand-nephews and grand-nieces. The will was admitted to probate on January 11, 1927. Shortly thereafter this contest was filed.

The bill alleges mental incompetency of the testatrix, and that John E. Keyser exercised an undue influence to induce the execution of the will while he was the agent and confidential representative of the testatrix, and that as such he improperly took advantage of his confidential relationship to procure the execution of the will by the use of fraudulent statements and misrepresentations to the testatrix. The record contains no evidence of false or fraudulent statements or misrepresentations on the part of John E. Keyser, and that issue of fact is no longer in the case. In his answer he denied the allegations of undue influence, lack of proper execution of the instrument and lack of testamentary capacity on the part of the testatrix; also denied any false representations or statements made to her.

Catherine Keyser resided on a farm near Allendale, in Wabash county, Illinois, until the year 1890, when she removed to Terre Haute, Indiana, where she remained until the time of her death. She was the owner of 167 acres of timber land in Wabash county, and from the time she left Illinois until January 10, 1919, her brother, John Keyser, now deceased, acted as her agent in renting the farm. On that date defendant in error John E. Keyser became her agent, receiving from John Keyser the sum of $1265.49, the money and property of the testatrix., From that time until the time of her death he rented her farm and handled her affairs as her agent. On January 3, 1923, as agent and attorney in fact for her, he sold the timber off of certain portions of the land for the sum of $12,500. On August 13, 1924, the testatrix leased to him the oil and gas rights on the farm for a consideration of one-eighth of the oil produced and $50 per year for such gas as was produced, the lease to continue in force for a period of five years. On August 25, 1925, he sub-leased the oil and gas rights for the sum of $5500 and one-sixth part of all oil and $250 per year for the gas produced. In November, 1925, an oil well was drilled on the land and later two other wells.

Production of oil started at about sixty barrels per day but decreased to fifteen barrels per day at the time of the death of the testatrix. There is no testimony in the record to show whether she knew that the land was producing oil, other than the statement made to one of the witnesses that showed that she knew the oil wells were coming close to her land. No attempt was made by the contestants to show that she did not know of these matters or of the sale of the timber on the land.

It appears that the testatrix lived very frugally in Terre Haute. Some of the witnesses for contestants stated that she appeared to be in want, although none told of finding her without money. The room in which she lived during the later years of her life was cheaply furnished and she dressed very plainly. For a number of years after she went to Terre Haute she was employed at a hotel, doing light work. Some of the witnesses for the contestants stated that she had stated to them that she could not afford to live better than she was living, while others testified that she stated that she lived as well as she cared to. She lived for more than a year at St. Anthony's Hospital, in Terre Haute, during which time she paid seven dollars per week for her room. Sister M. Ida, a nurse at that hospital, testified that she left the hospital voluntarily; that the witness desired her to remain, and also that John E. Keyser desired that she remain there, but that the testatrix preferred to have a room to herself. During the time she was at the hospital, and for the greater part of the time she lived alone, she did not work. The testimony of some of the witnesses for the contestants indicates that they considered her a sort of pensioner and that they gave her food. The evidence also is that John E. Keyser and his family visited her and that plaintiffs in error at no time ever visited or paid any attention to her. The evidence shows that she was of a kindly disposition, though reticent, and was given to small charities, for which she seemed at all times to have

sufficient funds. The evidence also indicates that she was disinclined to talk about her affairs and told no one that she possessed property, except when one of the witnesses asked her whether she owned any property she stated that she had a timber farm in Illinois. The only evidence as to specific amounts of money sent to her by John E. Keyser is that of Sister M. Ida, who stated that she did not keep track of money that was sent, except that she knew of her at one time getting $50, at another time $75, at other times $100, and at another time $200; that she knew of her having $200 in the bank, but that was all that she knew that she carried in the bank. This witness testified that when the testatrix needed money she would write to John E. Keyser for it, who was managing her farm.

Concerning the mental competency of the testatrix to execute a will the contestants offered the testimony of eight witnesses, all of whom knew her for a number of years and some of whom saw her frequently. They all testified to her frugal way of living, and stated that they considered her incompetent to make a will at the time the same was executed. Various reasons were given for this opinion by the witnesses. Some testified that she was unable to remember things that had been stated to her, while others said that her memory did not seem at fault but that she did not understand readily what was told her. All of them agreed that she was a very devout member of the Catholic church and almost every morning attended early mass. Some of them testified that she could neither read nor write and that she did not understand the services that were being conducted at the church, while the testimony of others shows that she did write, though not well; that she would write to John E. Keyser when she needed money. Some of the witnesses for the contestants also testified to having written letters for her. One witness stated that she said she was afraid to go on the street car for fear she would be shut up in the car and be unable to get out. Some testi-

fied that she did not know the denominations of money and was unable to tell a dollar-bill from a five-dollar-bill, while others stated that she made purchases and was able to count the change received. Two witnesses testified that she more than once lost her way on the street in going from their home to hers and that this condition grew on her as she grew older; that in the later years of her life she was very feeble mentally and that she had the mind of a child. Two witnesses testified that they lived in the same rooming house in which she lived during the later years of her life; that she was very forgetful, and that she would come to their door several times a day, sometimes within a few minutes, to ask the time of day. It appears from some of these witnesses that her trunk was found to contain numerous articles of new, warm clothing that had not been worn.

Fourteen witnesses for the proponents testified that the testatrix was of sound mind. Among them was Dr. H. Bernheimer, of Terre Haute, who testified that he had lived in the same hotel in which she lived for many years, had been her physician and treated her on numerous occasions. This witness was also a witness to the will. Some of the witnesses for the proponents testified to having been with the testatrix on the occasion when she purchased various articles for her own use. These witnesses had at different times lived in the same rooming house with her or near her, and some of them saw her practically every day and were frequently in her room. All of the witnesses agree that she was frugal in her habits, and that her room, though clean, was not well furnished. Dr. Albert M. Mitchell, a witness for the proponents, testified that he had known her during the last two years preceding her death and treated her professionally, and that he considered her of sound mind. The testimony of attorney P. J. Kolb, of Mt. Carmel, Illinois, is that he drew her will; that John E. Keyser stated to him that his aunt desired witness to draw her will because he belonged to the same church and she desired to

give some legacies to the church; that he had not known her personally but their families had been acquainted for many years; that he went with Keyser to Terre Haute and there interviewed the testatrix; that the three of them drove about Terre Haute in the car of Keyser because the testatrix stated that she did not want the people there to know that she was making a will and did not desire to have it done at the house; that as they drove about she told him how she wanted her will drawn; that Keyser took no part in the conversation; that witness made notes of her directions as to the will and went to a hotel and drew the will; that later he returned to the car and read the will to her, and she then told him that she desired Dr. Bernheimer and Mrs. Lottie Scholl to witness the will; that they stopped at a restaurant where Mrs. Scholl was working and took her to the office of Dr. Bernheimer, and the will was executed in his private office; that the testatrix told witness the location of the restaurant and the doctor's office; that after reading the will he asked her if that was as she desired it, and she said that it was; that in the doctor's office he asked her if this was her last will and testament, and she said, "Yes, that is my will," and that she requested the witnesses to sign their names, which they did; that she wanted the will executed away from her home because she did not want the people of the house to know about her property, stating that the people of that city did not know that she had property but thought she was a poor person; that she appeared secretive about having property; that she stated to him that she had a farm in Wabash county and had money, but didn't state how much. This witness gave as his opinion that she was of sound mind and memory. He stated that when the will was executed it was turned over to Keyser.

Concerning the testatrix's knowledge of the objects of her bounty, the testimony of different witnesses, both for the contestants and the proponents, is that she spoke of

various members of the Keyser family, naming them; that she enrolled them in a society of the church and had prayers said for them, and that she gave their names separately and paid fifty cents for each one of them.

It is evident from the record that the testatrix was an uneducated, frugal woman, but the evidence does not show that she was not capable of knowing her property, the objects of her bounty or the meaning of a will, or that she was incapable of disposing of her property as she chose. The evidence does not disclose what knowledge she had of the extent of her property, but it does tend to show that she was mentally capable of such knowledge. That is the test. These questions were for the chancellor, who saw and heard the witnesses, and this court will not overturn his findings in the absence of a showing from the record that such findings were contrary to the manifest weight of the evidence. Such is not the case here. We are of the opinion that the chancellor was fully justified in finding that the testatrix was competent to make a will.

On the question of undue influence it was shown, as we have seen, that John E. Keyser occupied a position of trust and confidence towards the testatrix and that a fiduciary relation existed between them, in which he was the dominant party. The evidence also shows that he procured the lawyer to draw the will for the testatrix. He profited substantially by the will, as the estate amounts to approximately $30,000. This is sufficient to give rise to the presumption of undue influence. (*Seavey* v. *Glass,* 315 Ill. 611; *Wunderlich* v. *Buerger,* 287 id. 440; *Snyder* v. *Steele,* 287 id. 159; *Teter* v. *Spooner,* 279 id. 39; *Gum* v. *Reep,* 275 id. 503; *Yess* v. *Yess,* 255 id. 414; *Leonard* v. *Burtle,* 226 id. 422; *Weston* v. *Teufel,* 213 id. 291.) A presumption of fact is not, however, evidence, and it is necessary to look to the record to determine whether on the whole record the chancellor was justified in finding that the will in this case was voluntarily executed. As against this pre-

sumption the record shows that a warm affection existed between the testatrix and Keyser. The latter's mother died when he was a baby, and the testatrix went into the home of his father, her brother, and took care of the infant until he was fourteen years of age. The record shows that he was the only member of her family, aside from her brother, who ever came to see her or corresponded with her; that he and his family frequently came to Terre Haute to see her; that she had one of his baby pictures and a picture of his baby; that she frequently spoke of him, and that she spoke of none of the other of her relatives except when enrolling them in a society of the church for prayers. The testimony of attorney Kolb was, as we have seen, that in his conversations with her she told him, unassisted or uninterrupted by Keyser, just what she wanted to do with her property. Testimony of this character tends to rebut the presumption that the will was procured by undue influence. There is no evidence of any participation on the part of· Keyser in the making of the will, other than detailed here. Whether undue influence was shown by the record was likewise a question of fact for the chancellor, who saw and heard the witnesses and was in a better position than we to judge the credibility of their testimony. We are of the opinion that we would not be justified in holding that his finding in this regard is against the manifest weight of the evidence.

No questions of law are raised on this record. It contains no errors in the findings of fact that would justify reversal of the decree. The decree is therefore affirmed.

*Decree affirmed.*