(No. 20159.— )

EUGENIE MILLER *et al.* Appellants, *vs.* SAMUEL BLUMEN-
SHINE, Exr., *et al.* Appellees.

*Opinion filed April 23, 1931.*

BARNETT & WILSON, and MARSHALL SOLBERG, for appellants.

GEORGE J. JOCHEM, and MARY DOUBET CASSELL, for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Appellants, Eugenie Miller, Edith Thompson and Charles P. Weigand, nieces and nephew and heirs-at-law of Phillip Weigand, deceased, filed a bill in the circuit court of Peoria county to contest the validity of the last will and testament of the deceased, making appellees, the executor and beneficiaries of the will, defendants, and charging a want of testamentary capacity and undue influence on the part of certain of the beneficiaries. Answers of appellees, and a replication thereto, were filed. There was a trial before a jury, which returned a verdict finding in favor of the validity of the will. Appellants' motion for a new trial was overruled and a decree entered finding that the instrument in question was the will of Weigand and dismissing the bill for want of equity. This appeal followed.

Phillip Weigand died on March 20, 1928. At the time of his death he was the owner of certain real estate situated in the city of Peoria. He had no children and his wife had died about ten months before his death. By the will, which is dated March 10, 1928, he bequeathed to Robert Dingeldine some stock in the Commercial Loan and Homestead Association of Peoria and directed that the rest of his estate should be divided equally among Marguerite King, Hattie Blumenshine, Lulu Blumenshine, Annie Dingeldine,

Elmer Frederick and Lulu Graves. Samuel Blumenshine was named as executor. The beneficiaries named in the will, except Robert Dingeldine, are nieces and nephews of Louisa Weigand, the deceased wife of the testator. Robert Dingeldine is the husband of Annie Dingeldine, and Samuel Blumenshine, the executor, is the husband of Lulu Blumenshine. Appellants are the children of a deceased brother of the testator.

At the time of his death testator was about eighty years of age. For many years prior to the death of his wife he and she conducted a small grocery store in the city of Peoria. After the death of his wife the testator lived alone and managed the store by himself until Friday, March 9, 1928, on which date he was taken to the hospital, where he died eleven days later of bronchial pneumonia. The will was written and executed while he was in the hospital. It is the contention of appellants that it was executed on March 15, but it is dated March 10, and according to the claim of appellees that is the date it was executed. The will was admitted to probate by the probate court of Peoria county.

Appellees introduced a transcript of the evidence of the subscribing witnesses to the will, on which the will was admitted to probate in the probate court, and the evidence of sixteen witnesses to prove testamentary capacity. Four of those witnesses were salesmen for wholesale business firms who had known the testator for a number of years before he died and who called on him at his store and sold him goods and collected from him for goods sold. They saw and did business with him every week or two and all of them had called on him a short time before his death. One of them called on him on the day before, and another of them on the second day before, he was taken to the hospital. The testimony of all four of those witnesses showed that he transacted his business intelligently, paid them in cash for the goods he bought and took receipts therefor.

The testimony of some of them showed that they saw him transact business with his customers in the usual and ordinary way that men in his business do and that he discussed the topics of the day intelligently. They all gave it as their opinion that he was of sound mind and memory. Louis Triebel, a resident of Peoria and an acquaintance of the deceased, a salesman of monuments and cemetery memorials, called on the testator on March 3 and 5, 1928, for the purpose of selling him a monument. March 3 was a busy day in the store for the testator and he asked Triebel to come back on the following Monday, March 5, which he did and sold him a monument for his deceased wife. He exercised care in selecting the monument, asked for the lowest cash price, and paid for the same after receiving a cash discount. He informed Triebel that he wanted his wife's name, the date of her birth and the date of her death, and his own name and the date of his birth, placed on the monument, and he gave to Triebel the dates of her birth and death, as well as her name and the date of his birth. From these conversations and his manner of transacting that sale and purchase Triebel gave it as his opinion that he was of sound mind and memory on March 3 and 5, 1928.

Christian Seizinger, one of the attesting witnesses, testified in substance as follows: He was sixty years of age and had resided in Peoria for the last forty years. He knew the testator during the last twenty-five years of his life and lived in one of his houses back of his store and residence for fifteen years. During that period he saw him every day, and after his wife's death witness visited him every day, helped him in the store and ran errands for him. The testator conducted the business of the store, waited on customers, bought goods and collected the rent from his tenants and gave them receipts for the rent. He read the newspaper every day. On several Sundays witness had driven with him out into the country to visit with Mr. and Mrs. Samuel Blumenshine and with another niece of the testator's

wife. Witness never saw any of appellants at the testator's residence. The testator had a cold for some days before he went to the hospital but was in the store every day. On the morning of Friday, March 9, 1928, witness went over to see him, and he was then standing before a mirror shaving himself. Witness went back to his residence and had breakfast and then returned to the home of the testator. He said he did not feel well and complained of being "tight around the chest." Witness persuaded him to have a doctor come to see him. When the doctor came he had him taken to the hospital. On the following morning, Saturday, March 10, witness saw the testator at the hospital, and he asked witness to go and get George Jochem, a lawyer, and witness did so. No one besides witness was with the testator when he asked witness to get Jochem. Hattie Blumenshine, Annie Dingeldine and Isaac Graves were at the hospital with the testator when Jochem arrived there. They and witness waited out in the hall while Jochem was in the room with the testator. Jochem came out into the hall and told Mrs. Blumenshine that the testator "wouldn't make the will; he wouldn't pay for it because he made one before, and that is enough, he says." Mrs. Blumenshine told Jochem to go back and make the will and she would see that he was paid. After a little while Jochem came out and said he was going to make the will. Later he came out again and called for witness and a nurse, Thelma Humphrey, to come into the room to be witnesses to the will. Witness and Miss Humphrey went into the room. The testator signed the will in their presence and they signed it as witnesses in his presence and in the presence of each other. The will was not read to the testator in witness' presence, but the testator answered yes when asked by Jochem if the will had been read to him and if it was as he wanted it. The will was executed before noon on Saturday, March 10.

Thelma Humphrey testified in substance as follows: In March, 1928, she was a student nurse at the Proctor Hos-

pital, in Peoria, being assigned to the second floor. She remembered the execution of the testator's will. She heard the bell ring and went into the room occupied by him. Jochem and Seizinger were in the room with the testator, who was quietly lying in bed. Jochem informed her that she was wanted as a witness to the will. The testator signed the will while in bed, without any assistance, and then she and Seizinger signed it as witnesses in the presence of the testator and of each other. She did not hear the will read or see any of it written. She did not notice a group of people at the door of the testator's room when she went in or when she went out. She did not remember what day the will was executed, but was of the opinion the time was after lunch, probably between one and two o'clock in the afternoon. Seizinger and the testator were in such positions in the room that both of them could have seen her sign the will, Seizinger was in such a position that he could have seen the testator sign his name to the will, and the testator was in such a position that he could have seen her and the other subscribing witness sign the will as witnesses. She also testified that Jochem, the testator, Seizinger and herself were the only persons in the room at the time the will was executed. Both of said witnesses stated that it was their opinion at the time the will was executed that the testator was of sound mind and memory and that was still their opinion.

Marie Randall, another witness, who until about seven years before his death was a neighbor of the testator and often visited with him and his wife, testified she had often heard him speak of the fact that his wife's folks came to see them and visited with them while his folks paid no attention to them. He often spoke of how kind the children of his wife's relatives were to them and their visiting back and forth with him.

Catherine Hummel, another witness, has resided in the neighborhood where the testator lived for twenty or thirty

years and knew him and traded at his store during that period. She testified that she saw him every day at his store after his wife's death and saw him in his bed on the morning of the day he was taken to the hospital, and that his health failed somewhat after the death of his wife and he became partially deaf. Effie McConnell and Ella C. Martin, two members of the Rebecca Lodge, of which the testator was a member, who had known him many years and conversed with him on lodge matters and other topics and who visited him at the hospital during his last illness, testified that they called on him at his home at least once a month after his wife's death and at the hospital on March 13, 1928. John Eichenlaub, a salesman for a biscuit company, called on the testator in a business way every week, sold him goods for several years, talked to him on different business conditions, business affairs, items of news in the newspapers, and saw him last the day before he went to the hospital, and said he would purchase merchandise from him and make intelligent inquiries as to the prices and always demanded a receipt when he paid for what he bought. Harry Maple testified that he saw the testator every day— practically twice a day—for four or five years preceding his death, sold him bread and cakes and conversed with him on various subjects. He stated the testator would wait on customers, make change and would pay witness for the merchandise sold him, and that they would discuss news of the day, current topics and other matters. He considered him a brilliant man and one who was very well read. The last five witnesses testified that it was their judgment that the testator was of sound mind and memory during the whole time that they knew him.

Clara Shearer, another witness, was a tenant of the testator for six years and resided near and traded at his store. She saw him often, the last time on March 5, 1928. John Huverstuhl, another witness, resided in the testator's neighborhood and knew him for thirty years before his death.

He last saw him and had a conversation with him in January, 1928. Philip Groves, whose wife was in the hospital when the testator was, and his mother, Leila Groves, testified that they visited the testator in his room at the hospital on Sunday, March 11, 1928, and that they had known him for a number of years. Julia Blumenshine, another witness, the wife of a brother of Samuel Blumenshine, testified that she called on the testator at the hospital on March 12, 1928, and had a conversation with him and heard the conversations between him and others. The last five witnesses all testified that in their judgment the testator was of sound mind and memory at the times when they saw him.

For appellants there were just four witnesses who testified on the question of the sanity or insanity of the testator. Two of those witnesses were members of the Odd Fellows lodge of which the testator was a member and who knew him for many years before his death. The testimony of those two witnesses is in substance as follows: George Wilde said he was asked by the lodge to sit up with the testator, who was at the hospital, on the nights of March 9 and 10, 1928. At the time of the death of the testator's wife, and previous to her death, he was in fairly good health and mentally sound. After that time he gradually became weaker, both physically and mentally. Witness saw the testator about ten days before he was taken to the hospital, and also three or four days prior to that time, and talked to him at those times. He was then weak, both physically and mentally. From the time he lost his wife, about a year before he died, witness kept in touch with him. On the 9th or 10th of March he visited him at the Proctor Hospital and conversed with him about the lodge and general conditions down at his store. He asked him how he was getting along, and he replied that he was getting along fairly well. He asked witness some questions "over again" about some of the older members that witness had already told him about.

Witness told him that he ought to go some place and take a good rest, "but you couldn't tell that Dutchman anything." He noticed his mental condition was failing shortly after the death of his wife, but he continued to do business at his store. Witness was in the store after the death of his wife, several times. "I suppose he was running it; didn't see anybody else running it. There was some elderly man occasionally around there helping him. Customers probably came in the store, but I didn't pay attention to that. I don't remember whether he waited on any customers or not. He had a stock of goods on hand while I was in the store." Witness was asked the question as to whether or not he had an opinion as to whether the testator was of sound or unsound mind, and replied that he had an opinion on that question, but when he was asked to state what his opinion was, his answer to that question was, "a weak condition."

Clair Hurd, the other member of the lodge, who sat up with the testator on the nights of March 14 and 15, 1928, testified that he was on those nights irrational and very restless; that he seemed to be, by his actions, "wrapping bundles and pulling string," and was saying, "Hurry up, there; we won't get them out for dinner." He also testified that the testator had to be "catheterized" so he could pass his urine, and that the nurse had to give him hypodermic injections to quiet him and keep him on the bed.

Beulah Mellert, a special nurse at the hospital, was in charge of the testator at the hospital from the morning of March 16, 1928, until his death, at about one o'clock of the morning of March 20, 1928. She testified that during all of that period of time he was very restless and was irrational; that he tried to get out of bed many times during that period, and that it was necessary to give him hypodermic injections of morphine and to remove his urine with a catheter, and that he was during all that time of unsound mind. Dr. R. L. Greene, the testator's physician, testified that he had been a practicing physician in Peoria since 1898

and knew Weigand in his lifetime and treated him for bronchial pneumonia during his last illness, and that he had a high temperature on the nights of March 9 and 10, 1928, and gradually declined until he died. He saw him at his store first and then ordered him to the hospital. He had not been his physician prior to his last illness. He expressed no opinion as to his mental condition on any day of his illness or at any other time.

Isaac Graves, a witness for appellants, testified in substance as follows: He was a brother of the wife of the testator and eighty-four years of age. He was at the hospital with the testator every day from March 10 until his death, and sat up at night with him on March 10, 13 and 15. During all of that time the testator, in his opinion, was of unsound mind. He was very restless; seemed to be wrapping and tying packages; wanted to get up to wind a clock in his store, and on one or two occasions did get out of bed. Witness was at the hospital on the day the will was executed. That was Thursday, March 15. He was not there when Jochem came to write the will, but when witness came back from lunch that day Jochem was there. Annie Dingeldine, Lulu Blumenshine and Christian Seizinger were there in the hall outside the door of the testator's room. Jochem came out of the room three times before the will was executed. He told Lulu Blumenshine and Annie Dingeldine that the testator would not sign the will, and Lulu Blumenshine told Jochem to go back and get him to sign. Witness did not hear what Annie Dingeldine said. When Jochem came out the fourth time he called Seizinger in to act as a witness and wrote something on a piece of paper and gave it to Mrs. Blumenshine. This happened in the afternoon of Thursday, March 15, and the testator was more restless than ever before on that day. He got out of bed and into the hall and had to be carried back to bed. Witness was not friendly with Mr. and Mrs. Blumenshine and Mr. and Mrs. Dingeldine. He had had trouble with

them some years ago and had also had trouble with Blumen-shine about the location of Mrs. Weigand's grave. He wanted appellants to have the testator's property, and was apparently a witness very much prejudiced against appellees and rather hostile to the idea of their becoming the benefici-aries of the will.

Harriet D. Harrington, who was acquainted with the testator and his wife during their lifetime and who was friendly with appellant Charles P. Weigand from childhood, testified that Charles lived with the testator and his wife · from the time he was seven until he was fourteen years of age; that the relations between the testator and his wife and appellants were friendly; that at one time the testator and his wife told her they expected to make Charles their heir, and that they spoke to her of being glad that Eugenie Miller and Edith Thompson called on them when they came to Peoria to the funerals of their father and of the testator's aunt; that at another time they said they felt badly because they understood at one time Charles came to Peoria and walked past their place but did not come to see them. This witness also stated that she had talked to Seizinger, and he told her that the will was executed on either the Thurs-day or Friday night before the testator died. Gertrude Fromme, a friend of Edith Thompson and Eugenie Miller, who live in Chicago, testified that these two appellants called on the testator and his wife in Peoria about eight years be-fore the testator's death; that Eugenie Miller attended his funeral, and that Edith Thompson did not attend the funeral because she was ill. Eugenie Miller and Edith Thompson testified that they did not hear of the testator's illness until after his death. The nine witnesses aforesaid were all the witnesses who testified for appellants in this case.

Christian Seizinger very positively denied the statements attributed to him by Miss Harrington, a witness for appel-lants. His testimony concerning her and her statements are the following: He never knew her until "she came up

here last summer." He did not tell Miss Harrington that the will of the testator was made on Thursday before he died on Tuesday, and did not say to her that in substance. He was asked the question whether or not he told Miss Harrington that the testator had to be urged to make the will, or "words to that effect." His answer was that he did not tell her that or that in substance. He further testified that he was not related in any way to the parties to this suit and had no interest in the question as to how the property should be distributed. Mrs. Lulu Blumenshine testified in rebuttal that she did not on the day the will was executed tell Jochem, when he came out into the hall from the testator's room, either to go back and make him sign the will or to get him to sign the will. She further testified that the paper that he handed her in the hall was not the will signed by the testator, or anything concerning it, but was simply a paper upon which was written his address in his own handwriting, and that he wrote that address on the paper while he was standing in front of her in the hall.

It is urged by appellants that the decree is against the manifest weight of the evidence. The evidence for appellants that the will was not executed on the 10th day of March (the date it bears) but on the 15th day of March, consists solely of the testimony of Isaac Graves, an old man who was unfriendly to the beneficiaries of the will. On the other hand, Christian Seizinger, one of the attesting witnesses, states positively that the will was executed on the day of its date. There was some attempt to impeach his testimony by showing that he made a statement out of court that the will was executed on either Thursday or Friday night before the death of the testator. The witness who testified to this statement is shown to be very friendly to the appellants and not entirely impartial. All of the evidence tends to show that the will was not executed at night, and while Thelma Humphrey, the student nurse who was the other attesting witness that testified on the trial, did

not recall the exact date of the execution of the will she did state that the testator was lying quietly in bed just before he signed the will and that he raised himself up in bed and signed the will without assistance, and that he was then of sound mind and memory. When all of the evidence is considered, the finding that the testator had testamentary capacity at the time the will was executed cannot be said to be manifestly against the weight of the evidence. It is overwhelmingly shown by the evidence that he was of sound mind and disposing memory at the time he executed the will and at all times previous thereto.

It is contended by appellants that the evidence establishes that appellees Lulu Blumenshine and Annie Dingeldine were instrumental in procuring the will to be made, that there is no proof that the will was read to the testator before he signed it, and that therefore there was created a presumption of undue influence. The testimony of Seizinger is that it was at the request of the testator, when no one else was present, that he went to the office of Jochem and asked him to come to the hospital to make the will. There is no showing of a fiduciary relationship between the testator and any of appellees before the will was executed. None of the appellees were in the room with Jochem and the testator when the will was written. There is nothing in the evidence to show that any of the appellees exerted any influence upon the testator to procure the will to be made in their favor. The evidence does show that Lulu Blumenshine and Annie Dingeldine were in the hall at the hospital when the will was written and executed; that before the will was written Jochem came out into the hall and told them that the testator refused to pay for having the will written, and that Lulu Blumenshine told him to go back and draft the will and she would see that he was paid. There is no testimony in the record that tends to show that the testator was unduly influenced to sign a will that he did not want to make or that he was urged by anyone to make a

will in favor of any of the appellees. The decided preponderance of the evidence is to the effect that previously to the making of the will he had made up his mind at one time to will his property to Charles P. Weigand, who had previously lived with the testator and his wife, but that he later changed his mind and finally concluded that he would not will his property to Charles because he had passed the home of the testator without visiting him or in any way making known his presence to him. The evidence of some of appellants' witnesses, as already shown, is corroborative of this change of the testator's disposition to ignore Charles in his will. It is true that Isaac Graves testified that Jochem came out into the hall and told Lulu Blumenshine and Annie Dingeldine that the testator would not sign the will, and that Lulu Blumenshine told him to go back and make him sign it. His evidence in this particular was very positively denied by Mrs. Blumenshine, and the witness Graves was contradicted in other statements that he made, and the weight of the testimony is decidedly to the effect that no one attempted to coerce the testator to sign the will at all. On the issue of the undue influence we think the jury were warranted in finding against appellants. The chancellor, who saw and heard the witnesses testify, approved the verdict, and under the evidence in this record we would not be justified in holding that this finding should be set aside. *Madden* v. *Keyser,* 331 Ill. 643.

Complaint is made that the court refused to give to the jury an instruction offered by appellants which stated that if the jury believed from the evidence that certain of the beneficiaries under the will were present at the time the will was executed, that none of the heirs of the testator were present at that time, that one or more of the beneficiaries were active in procuring the will to be executed, and that at the time the will was executed the testator was enfeebled by old age, disease or otherwise, then the proponents must show to the full and entire satisfaction of the jury that the

testator was not imposed upon. The refusal of this instruction was not error. There was no evidence that any of appellees were present in the room at the time the will was written or executed. The court instructed the jury on the general rule of law applicable on the question of undue influence, at the request of the appellants, and it was not error to refuse the instruction mentioned, as there was no evidence in the record upon which to base it.

It was error, as contended by appellants, for the court to give this instruction to the jury:

"The jury are instructed that the introduction in evidence of the transcript of the testimony of the subscribing witnesses to the will, certified by the judge of the probate court, together with the purported will itself, make a *prima facie* case, establishing the will, and that after a *prima facie* case has been made the burden of proof as to the whole case is upon those who are contesting the will to prove the allegations of their bill as to the lack of testamentary capacity of the testator or as to undue influence, by a preponderance of the evidence."

The transcript of the testimony of the subscribing witnesses to the will taken before the probate court shows that the witnesses testified that they believed, at the time their testimony was taken, that the testator was of sound mind and memory at the time the will was executed, but it does not show that they testified that they believed, at the time the testator signed the will, that he was of sound mind and memory. Under section 2 of the Wills act the oath of the attesting witnesses to a will is required to be "that they were present and saw the testator or testatrix sign said will, testament or codicil, in their presence, or acknowledged the same to be his or her act and deed, and that they believed the testator or testatrix to be of sound mind and memory at the time of signing or acknowledging the same." It is the belief of the witnesses at the time of the execution of the will, and not at a later date, to which the statute refers.

(*Britt* v. *Darnell,* 315 Ill. 385.) In this case, however, as in the *Britt case,* the testimony of the attesting witnesses was taken at the trial, and there can be no question that appellees did then make out a *prima facie* case. Furthermore, this is not a case in which it was proper to instruct the jury as to what constitutes a *prima facie* case. In all cases where the only evidence introduced is the evidence which under the statute makes a *prima facie* case it is proper to instruct a jury that a *prima facie* case has been made, but where evidence has been introduced by both parties in addition to the *prima facie* case by the proponent, the question is to be then decided by the jury on the whole of the evidence introduced by the parties, and the jury should not in such case be instructed as to what constitutes a *prima facie* case. It was also error to instruct the jury that after a *prima facie* case has been made the burden of proof as to the whole case is then upon those who are contesting the will to prove the allegations of their bill as to the lack of testamentary capacity of the testator by a preponderance of the evidence. In a will contest the burden of proof does not shift from the proponents to the contestants to prove the allegations of their bill by the preponderance of the evidence. *Donovan* v. *St. Joseph's Home,* 295 Ill. 125; *Sellers* v. *Kincaid,* 303 id. 216; *Grosh* v. *Acom,* 325 id. 474; *Peters* v. *Fekete,* 329 id. 268; *Oliver* v. *Oliver,* 340 id. 445.

The following instruction given for appellees is complained of by appellants:

"If the jury believe from the evidence that Phillip Weigand, at the time he executed the writing in question, was of sound mind and memory, it is wholly immaterial what you may believe as to his soundness of mind at any other time."

In *Anlicker* v. *Brethorst,* 329 Ill. 11, and *Miller* v. *Ahrbecker,* 320 id. 577, it is stated that such an instruction is

likely to mislead the jury by causing them to ignore evidence of the mental condition of the testator a reasonable time before or after the execution of the will. In this case, however, it is so clearly established that the testator was of sound mind and memory on March 10, 1928, (the date on which the will was executed,) and at all times previous thereto and for at least two days thereafter, that the giving of this instruction could not have prejudiced appellants. The only times that the testator was shown to be incapacitated to make a valid will was after March 13 and that this incapacity was caused by delirium and extreme suffering caused by the ravages of the disease on account of which he died on March 20.

There are also other instructions of which complaint is made that were offered and given on behalf of appellees, and complaints are made of the court's modifying other instructions. We have carefully examined the same, and our conclusion is that appellants were not prejudiced by the giving or modifying of such instructions.

The last contention of appellants is that the court erred in admitting in evidence the endorsements on the back of the will, to-wit:

"Last will and testament of Phillip Weigand deceased. Filed Mch. 23rd. A. D. 1928.
JOHN J. SIMMONS, *Probate Clerk.*

"Proved and admitted to record................A. D. 192..,
..................., *Probate Judge.*

"Recorded in record of wills 30 page 14 April 17th A. D. 1928.
JOHN J. SIMMONS, *Probate Clerk.*

There was no offer of the endorsements on the will so far as the record shows, and the record does not show that the endorsements were read to the jury or that the jury ever saw them. If the endorsements on the back of the will were offered in evidence by appellees no objection was made by appellants to such offer.

The contention of appellants that the will of the testator was signed on the 15th day of March is not supported by the evidence, and a finding of the jury to that effect could not have been legally sustained by the court under the evidence in this record. The evidence clearly shows by the witnesses for appellants that he was in such a· serious condition on that day that it is scarcely believable that he could have signed or have been induced to attempt the signing of the will. He was on that day and at all times thereafter very delirious, and by reason thereof the nurses in attendance were not physically able to keep him on his bed. The presumption is that the will was executed on the day of its date.

There were errors committed by the court in the giving of instructions on behalf of the appellees, and it is also true that appellants on their part must accept part of the blame for inducing the court to give similar erroneous instructions asked by them, in one or more of which the jury were told that the burden of proof in this case was on appellants. Their instruction No. 1 is in these words: "The court instructs the jury that the complainants· are not bound to prove their case beyond a reasonable doubt, but are bound to prove it by a preponderance of the evidence." This court has held many times that the complainants or the defendants cannot complain of errors by the court in the giving of instructions where it is shown that they have asked the court to give instructions that are erroneous for the same reasons as those of the other party against which they have made complaint.

The verdict of the jury is well sustained by the evidence in this case, and the decree of the court in approving of the same is affirmed.

*Decree affirmed.*